DANIEL O. BLAU (Cal. Bar No. 305008)
Email: blaud@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission, <br><br> Plaintiff, <br><br> vs. <br><br> Vu Anh Nguyen; Adam Michael Reed; and Anthony Xavier Moya, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants Vu Anh Nguyen, Adam Michael Reed, and Anthony Xavier Moya reside in this district.

## SUMMARY

4. This action involves a "free-riding" securities trading scheme orchestrated by defendant Vu Anh Nguyen ("Nguyen") which was aided and abetted by defendants Adam Michael Reed ("Reed") and Anthony Xavier Moya ("Moya"). Free-riding schemes generally involve a brokerage customer trading securities without having sufficient funds to pay for the trading. If the trading is profitable, the customer pockets the profit, but if the trading is unprofitable, the brokerage firm sustains the loss.

5. That is exactly what happened here - Nguyen created brokerage accounts and then used the brokerage firms' online systems to request electronic fund transfers ("EFTs") from bank accounts to the brokerage accounts. However, Nguyen knew that the bank accounts had insufficient funds to cover the EFTs. Nevertheless, he immediately began trading securities in the brokerage accounts using the funds from the fraudulent EFTs and saddling the brokerages with massive trading losses.

6. After his EFTs were rejected for insufficient funds, the brokerages through which Nguyen conducted his free-riding trading would freeze and eventually shut down his accounts. Nguyen would simply open accounts at other brokerages to engage in his free-riding fraud again. At other times, he would attempt to evade detection by opening brokerage accounts in the names of other persons, sometimes surreptitiously and sometimes with their cooperation.

7. Between July 2018 and April 2019, Nguyen engaged in free-riding in

26 accounts (including five accounts in the name of Reed and Moya) at eight brokerage firms. In these accounts, Nguyen made bogus EFT requests of $4.7 million and purchased over $16.6 million in securities. Nguyen's trading was largely unprofitable, and the brokerage firms were left with losses totaling almost $1.1 million while Nguyen was able to transfer $61,888 out of the brokerage accounts.

8. Reed and Moya aided and abetted Nguyen's free-riding scheme. Knowing that Nguyen would engage in free-riding in their accounts, Reed and Moya each opened accounts at two brokerage firms, linked the brokerage accounts to bank accounts, and provided Nguyen with the brokerage accounts' user names and passwords.

9. In Reed's and Moya's accounts, Nguyen made bogus EFT requests totaling almost $2 million that were rejected by the banks for insufficient funds, purchased over $8.5 million in securities, and left the brokerage firms with losses of over $560,000.

10. Reed, however, was able to transfer $2,287 out of one of his brokerage accounts to his bank account.

11. Moya did not transfer any funds to his bank account.

12. By this conduct, Nguyen violated Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Reed and Moya aided and abetted Nguyen's violations.

13. The SEC seeks permanent injunctive relief, conduct-based injunctions, disgorgement, and civil penalties against each defendant.

## THE DEFENDANTS

14. Defendant **Vu Anh Nguyen**, age 24, is a resident of Phoenix, Arizona.

15. Defendant **Adam Michael Reed**, age 25, is a resident of Phoenix, Arizona.

16. Defendant **Anthony Xavier Moya**, age 27, is a resident of Phoenix, Arizona.

## THE ALLEGATIONS

**A.    Nguyen's Free-Riding Trading, Generally**

17. Nguyen first began trading in securities in 2014 or 2015. Initially, Nguyen traded securities using money he earned from his jobs or money from student loans.

18. While engaging in this trading using real funds, Nguyen noted that there was a delay between the time that he initiated a transfer of funds from his bank account to his brokerage account and the time that the transfer was complete. During that delay period, the brokerage firm allowed him to trade securities using the funds to be transferred before those funds even arrived in his account.

19. Nguyen saw an opportunity to exploit that delay period by requesting the transfer of non-existent funds into his brokerage account and then trading securities during the delay period using the non-existent funds. He figured that he could use his profits from the securities trading to cover any overdraft fees incurred when the bank rejected the funds transfer for insufficient funds.

20. His free-riding scheme generally involved using his brokerage account's online system to initiate an EFT from his bank account to his brokerage account, and immediately engaging in rapid online securities trading for the three trading days that elapsed until the bank rejected the EFT for insufficient funds.

**B.    Nguyen's Free-Riding Trades**

   **1.    Nguyen's First Free-Riding Trading**

21. As of July 27, 2018, Nguyen had only $2.02 in his brokerage account after suffering $997.98 in realized trading losses from options trading.

22. In order to continue trading, Nguyen began his free-riding scheme.

23. On Friday, July 27, 2018, at 2:49 pm, Nguyen entered his account on Brokerage A's online system to initiate an EFT of $1,000 from his bank account.

The bank account had a balance of only $1.64.

24. At 2:53 and 2:56 pm, Nguyen entered online trades to purchase $950 in SPY options.

25. At 4:39 and 4:41 pm, Nguyen entered online trades to sell the SPY options at a profit of $1,240.

26. At 5:24 pm, Nguyen entered online trades to purchase $2,160 in AMZN options.

27. On Monday, July 30, 2018, at 2:05 pm, Nguyen entered his account on Brokerage A's online system to initiate an EFT of $2,000 from another bank account. The bank account had a balance of only $9.96.

28. At 2:07 and 5:47 pm, Nguyen entered online trades to purchase $1,078 in SPY and AMZN options.

29. On Tuesday, July 31, 2019, at 2:16 pm, Nguyen entered online trades to sell AMZN options at a loss of $2,575.04.

30. At 2:22 pm, Nguyen entered online trades to purchase $594 in SPY options.

31. At 2:23 pm, Nguyen entered online trades to sell SPY options purchased on July 30, 2018, at a loss of $6.

32. At 6:48 pm, Nguyen entered online trade to purchase $46 in SPY options.

33. On Wednesday, August 1, 2018, at 2:37 pm, Nguyen entered online trade to sell SPY options purchased on July 30 at a loss of $563.

34. Finally, on Thursday, August 2, 2018, at 12:01 and 11:47 am, the $1,000 and $2,000 EFT requests were rejected by the banks for insufficient funds.

35. After the EFTs were rejected by the banks, Brokerage A froze Nguyen's account, which by that time had suffered $1,904 in realized trading losses and fees and had a balance of -$1,971.

36. Brokerage A was able to collect the $1,971 from Nguyen and suffered

no losses.

37. Brokerage A closed Nguyen's account the same month.

**2. Nguyen's Free-Riding in September and October 2018**

38. Nguyen continued his free-riding at four larger brokerage firms in September and October 2018.

39. The free-riding at each of these firms followed the same pattern as at Brokerage A.

40. Like at Brokerage A, Nguyen's linked bank accounts had only small balances that did not come close to covering the bogus EFTs he initiated, and the free-riding trading at these other firms was generally unprofitable.

41. However, unlike at Brokerage A, his bogus EFTs, subsequent trading, and trading losses involved much larger sums.

42. These four brokerage firms have yet to recover their losses from Nguyen.

43. In September 2018, in his brokerage account with Brokerage B, Nguyen initiated EFTs for a total of $651,000 from a bank account with a balance of less than $700.

44. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $5,646,179.

45. His trading activity at Brokerage B resulted in a loss of $160,576.

46. In October 2018, in his brokerage account with Brokerage C, Nguyen initiated EFTs for a total of $250,000 from a bank account with a balance of $0.

47. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $290,081.

48. His trading activity at Brokerage C resulted in a loss of $7,413.

49. Also in October 2018, in his brokerage account with Brokerage D,

Nguyen initiated EFTs for a total of $90,000 from a bank account with a balance of -$400.

50. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $391,052.

51. His trading activity at Brokerage D resulted in a loss of $83,912.

52. Finally, October 2018, in his brokerage account with Brokerage E, Nguyen initiated EFTs for a total of $110,337 from a bank account with a balance of $12.

53. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $327,015.

54. His trading activity at Brokerage E resulted in a loss of $44,989.

55. When the banks rejected the EFTs for insufficient funds, the four brokerage firms froze and then closed Nguyen's accounts.

56. However, Nguyen was able to withdraw a total of $61,888 from his Brokerage B and Brokerage E accounts before the accounts were frozen.

57. Nguyen subsequently acknowledged in writing that he engaged in this free-riding trading.

58. In an effort to buy himself time and avoid litigation, Nguyen provided signed and notarized statements to Brokerage B and Brokerage D, dated November 2, 2018, stating he owed Brokerage B a total of $113,572 and Brokerage D $83,912 and promised to pay each firm $500 monthly until the debt was paid.

59. In December 2018, Nguyen paid $2,000 to Brokerage B.

60. From December 2018 through June 2019, Nguyen has paid Brokerage D a total of $1,150.

3. **Nguyen's Free-Riding in Accounts in the Names of his Girlfriend and Mother**

    a. **Nguyen Opens Accounts without Authorization**

61. Nguyen also engaged in free-riding in accounts in the name of his then-girlfriend and his mother at Brokerage D and Brokerage C.

62. Starting in October 2018, Nguyen opened accounts in his mother's and now former girlfriend's names after his name had been flagged at numerous brokerage firms and he was no longer able to conduct online trades in his own name.

63. Nguyen opened these brokerage accounts and engaged in the free-riding trading without the knowledge of his mother or former girlfriend.

    b. **Nguyen's Trading in the Unauthorized Accounts**

64. In October 2018, Nguyen opened a brokerage account at Brokerage D in his former girlfriend's name.

65. In this account, Nguyen initiated EFTs for a total of $200,000 from a bank account with a balance of $0. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $237,404 in this account.

66. His trading activity in his former girlfriend's name at Brokerage D resulted in a loss of $17,798.

67. In January 2019, Nguyen opened a brokerage account at Brokerage D in his mother's name.

68. In this account, Nguyen initiated EFTs for a total of $400,000 from a bank account with a balance of $0. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $206,447 in this account.

69. His trading activity in his mother's name at Brokerage D resulted in a loss of $61,723.

70. In March 2019, Nguyen opened a brokerage account at Brokerage F in his former girlfriend's name.

71. In this account, Nguyen initiated EFTs for a total of $100,000 from a bank account with a balance of less than $1,000. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $106,298 in this account.

72. His trading activity in his former girlfriend's name at Brokerage F resulted in a loss of $21,286.

73. In April 2019, Nguyen opened a brokerage account at Brokerage C in his former girlfriend's name.

74. In this account, Nguyen initiated EFTs for a total of $175,000 from a bank account with a balance of $0. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $124,476.

75. His trading activity in his former girlfriend's name at Brokerage C resulted in a loss of $14,215.

76. In April 2019, Nguyen opened another brokerage account in his former girlfriend's name, this time at Brokerage G.

77. In this account, Nguyen initiated EFTs for a total of $10,000 from a bank account with a balance of $0. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $27,493.

78. His trading activity in his former girlfriend's name at Brokerage G resulted in a loss of $1,137.

### 4. Nguyen Continues Free-Riding at Smaller Brokerage Firms

79. By March 2019, larger brokerage firms had closed Nguyen's accounts. Nevertheless, Nguyen continued his free-riding at smaller brokerage

firms in accounts in his name.

80. In March 2019, Nguyen opened a brokerage account at Brokerage F, where he initiated EFTs for a total of $430,000 from a bank account with a balance of less than $1,000. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $744,982.

81. His trading activity at Brokerage F resulted in a loss of $122,602.

82. In April 2019, Nguyen opened a brokerage account at Brokerage H, where he initiated EFTs for a total of $100,000 from a bank account with a balance of less than $500. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $7,638.

83. His trading activity at Brokerage H resulted in a gain of $598.

**C.  Nguyen's Free-Riding Trading with Reed and Moya**

84. Nguyen also engaged in free-riding in the names of two friends, Reed and Moya.

85. Unlike the free-riding he did in his mother's and former girlfriend's accounts, Nguyen's free-riding in Reed's and Moya's accounts was done with the knowledge and cooperation of Reed and Moya.

86. Nguyen explained the free-riding scheme to Reed and Moya and offered to engage in such free-riding in any accounts they opened.

87. In or around September-October, 2019, Reed opened accounts at Brokerage B and Brokerage D, linked them to bank accounts, and provided Nguyen with the brokerage accounts' user names and passwords so Nguyen could engage in the free-riding trading.

88. In or around December 2018, Moya opened accounts at Brokerage B and Brokerage D, linked them to bank accounts, and provided Nguyen with the brokerage accounts' user names and passwords so Nguyen could engage in the

free-riding trading.

89. Nguyen then engaged in large scale free-riding in Reed's and Moya's Brokerage B and Brokerage D accounts, resulting in combined losses of over $560,000.

90. In September and October of 2018, Nguyen traded in a brokerage account at Brokerage B that Reed opened.

91. In this account, Nguyen initiated EFTs for a total of $400,000 from a bank account with a balance of $26. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $40,086.

92. His trading activity in Reed's name at Brokerage B resulted in a loss of $52.

93. In October 2018, Nguyen traded in a brokerage account at Brokerage D that Reed opened.

94. In this account, Nguyen initiated EFTs for a total of $600,000 from a bank account with a balance of $423. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $2,190,528.

95. His trading activity in Reed's name at Brokerage D resulted in a loss of $209,931.

96. In December 2018, Nguyen traded in a brokerage account at Brokerage D that Moya opened.

97. In this account, Nguyen initiated EFTs for a total of $460,000 from a bank account with a balance of $25. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $1,531,896.

98. His trading activity in Moya's name at Brokerage D resulted in a loss of $159,633.

99. Also in December 2018, Nguyen traded in a brokerage account at Brokerage B that Moya opened.

100. In this account, Nguyen initiated EFTs for a total of $526,000 from a bank account with a balance of $25. Although these EFTs were eventually rejected for insufficient funds, Nguyen took advantage of the delay between the EFT initiation and rejection to purchase securities valued at $4,766,099.

101. His trading activity in Moya's name at Brokerage B resulted in a loss of $191,129.

102. Brokerage B and Brokerage D froze and then closed these account after the banks rejected the EFTs for insufficient funds.

103. Reed was able to withdraw a total of $2,287 from his Brokerage B account before it was closed.

104. Moya did not withdraw any funds from his brokerage accounts.

105. In a signed and notarized statement dated January 28, 2019, Moya acknowledged that he owed Brokerage B $191,129, that he would make his best efforts to repay the full balance, and would make $300 payments monthly beginning in February 2019.

106. Moya, however, never made any of the promised payments to Brokerage B.

107. In a written settlement agreement dated March 1, 2019, with Brokerage D, Moya acknowledged being the owner the Brokerage D account in which Nguyen traded; that the account had an outstanding debit balance as a result of margin transactions made based on uncleared funds that were subsequently dishonored; and that he owed Brokerage D the debit balance in the account.

108. Moya also each agreed to make monthly payments to Brokerage D.

109. Moya made only one $200 payment to Brokerage D.

110. In a written settlement agreement dated December 14, 2018, with Brokerage D, Reed acknowledged being the owner the Brokerage D account in

which Nguyen traded; that the account had an outstanding debit balance as a result of margin transactions that were subsequently dishonored because they were based on insufficient funds; and that he owed Brokerage D the debit balance in the account.

111. Reed also each agreed to make monthly payments to Brokerage D.

112. However, Reed has made only one $500 payment to Brokerage D.

**D.     The Fraudulent Nature of Nguyen's Conduct**

113. Nguyen free-riding scheme was intended to, and in fact did, deceive the brokerage firms through which he traded.

114. By requesting EFT's through the brokerage firms' platforms, he deceived the brokerage firms into believing that he (or those in whose names he was trading) had sufficient funds to pay for the securities purchases he subsequently made.

115. In addition, by logging into others' brokerage accounts, Nguyen also deceived the brokerage firms that those other persons were requesting EFTs and buying securities.

116. By requesting EFTs for amounts greater than his bank balances, Nguyen misrepresented to the brokerage firms through which he traded that there were sufficient funds to pay for the securities he purchased, and he misrepresented his identity when logging into the accounts of others to engage in his free riding.

117. The brokerage firms would not have let Nguyen trade securities had they known that the banks would reject Nguyen's EFTs for insufficient funds. Indeed, once the EFTs were rejected, the brokerage firms froze and then closed all of Nguyen's, Reed's and Moya's accounts.

118. Nguyen knew, or was reckless in not knowing, that his bank accounts did not have sufficient funds to cover the EFTs he requested. As detailed above, he regularly initiated EFTs for hundreds of thousands of dollars from bank accounts with balances of less than $1,000.

119. Nguyen did not just engage in free-riding at one firm, but rather at multiple brokerage firms, both large and small, over the course of ten months. Moreover, once he learned that he could no longer trade online in his own name, he began to open accounts in the name of other people so that he could evade detection and continue his free-riding scheme.

120. Nguyen took additional steps to hide his fraudulent scheme. Nguyen perpetrated his free-riding scheme principally from a desktop computer located at his home in Phoenix, Arizona.

121. Most of the activity in his accounts coincided with log-ons to his accounts from a computer with an IP address that traced back to Nguyen's residence.

122. However, after some of his brokerage accounts were shut down for using the same IP address as previously closed accounts, Nguyen used a virtual private network, or VPN, to mask his IP address and to prevent the brokerage firms from detecting his IP address.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Nguyen)**

123. The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

124. Defendant Nguyen engaged in a fraudulent scheme in which he purchased over $16.6 million in securities by falsely representing that he had the funds available to cover the EFTs he initiated and then trading using funds made available to him based on those misrepresentations.

125. By engaging in the conduct described above, Defendant Nguyen, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the

facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

126.   By engaging in the conduct described above, Defendant Nguyen violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of

### Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

### (against Defendants Reed and Moya)

127.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

128.   With knowledge of Defendant Nguyen's intent to engage in a fraudulent free-riding scheme, Defendants Reed and Moya each opened brokerage accounts, linked them to bank accounts, and provided Defendant Nguyen with the brokerage accounts' user names and passwords to enable Defendant Nguyen's free-riding trading.

129.   By reason of the conduct described above, Defendants Reed and Moya knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Defendant Nguyen in his violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and subsections (a) and (c) of Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Nguyen, Reed, and Moya, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; permanently enjoining Defendants Nguyen, Reed, and Moya, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from opening a brokerage account without first providing to the relevant brokerage firm(s) a copy of the filed complaint and Judgment in this matter; and permanently enjoining Defendant Nguyen, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from directly or indirectly, trading securities in any brokerage account he owns controls, or has access to that does not have settled cash equal to or greater than the amount of the securities trade(s).

### III.

Order Defendants Nguyen and Reed to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**IV.**

Order Defendants Nguyen, Reed, and Moya to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 11, 2020

/s/ Daniel Blau
Daniel Blau
Kelly Bowers
Attorneys for Plaintiff
Securities and Exchange Commission